UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3|31|17

TRUSTEES OF THE NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS
PENSION FUND, WELFARE FUND,
ANNUITY FUND, and APPRENTICESHIP,
JOURNEYMAN RETRAINING,
EDUCATIONAL AND INDUSTRY FUND,

**ORDER**

15 Civ. 1191 (PGG)

Plaintiffs,

-against-

THE HALCYON CONSTRUCTION CORP.,

Defendant.

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiffs Trustees of the New York City District Council of Carpenters Pension

Fund, Welfare Fund, Annuity Fund, and Apprenticeship, Journeyman Retraining, Educational

and Industry Fund (the "Funds") are multi-employer labor-management trust funds. Plaintiffs

filed this action on February 19, 2015, alleging that Defendant Halcyon Construction

Corporation failed to remit required payments to the New York City District Council of

Carpenters from 2007 to 2014 in violation of Sections 502(a)(3) and 515 of the Employee

Retirement Income Security Act of 1974 ("ERISA") and Section 301 of the Labor Management

Relations Act of 1947 ("LMRA"). (Cmplt. (Dkt. No. 1) ¶ 1)[1] Plaintiffs contend that they are

owed $81,205.26 in unpaid contributions, interest, liquidated damages, and audit costs.[2] (See

---

[1] Unless otherwise indicated, (1) all cites are to the docket in the instant action; and (2) the page
numbers of documents referenced in this Order correspond to the page numbers designated by
this District's Electronic Case Filing system.

[2] The figure used in Plaintiffs' briefs – $81,205.46 – reflects a mathematical error. (See Pltf. Br.
(Dkt. No. 46) at 5, 9, 14) The sum of the damages which Plaintiffs seek is $81,205.26. (See

Pursuant to Article XI of the Millwright CBA, employers are required to make contributions to the Funds on a weekly basis. (See Millwright CBA (Dkt. No. 45) Ex. 5, Art. XI, Sec. 1(a))  The Millwright CBA also requires employers to produce their books and records to the Funds for audit purposes at the Funds' request. (See id. at Sec. 7)  The Millwright CBA further provides that employers are bound by the Funds' Agreements and Declarations of Trust ("Trust Agreements"). (See id. at Sec. 4)  As set forth in the Trust Agreements, when employers fail to "promptly . . . report and/or pay the Contributions due to such funds," the Trustees are entitled "to assess and collect, to the full extent permitted at law and in equity, in addition to the principal amount of the Contributions determined to be due, any and all interest, damages, penalties and other remedies, including, but not limited to, liquidated damages, attorneys' fees, costs and expenses." (Trust Agreements (Dkt. No. 45) Exs. 10-13, Art. V, Sec. 2(a); see Pltf. R. 56.1 Stmt. (Dkt. No. 47) ¶ 20)

During the time period at issue (2007 to 2014), "[t]he Funds operated under two Collection Policies," the "2007 Collection Policy"[5] and the "2014 Collection Policy." (Pltf. R. 56.1 Stmt. (Dkt. No. 47) ¶ 22; Def. R. 56.1 Resp. (Dkt. No. 52) ¶ 22; see 2007 Collection Policy (Dkt. No. 45) Ex. 14; 2014 Collection Policy (Dkt. No. 45) Ex. 15)  Both Collection Policies require employers to "submit . . . a remittance report of the total hours worked by all participating employees of the employer in the contribution period." (2007 Collection Policy

---

Defendant challenges contributions, interest, and liquidated damages associated with contributions due prior to February 19, 2009.  It is undisputed that the Millwright CBA ran until June 30, 2011. (See Pltf. R. 56.1 Stmt. (Dkt. No. 47) ¶ 11; Def. R. 56.1 Resp. (Dkt. No. 52) ¶ 11)
[5] In his declaration, Luke Powers – the Funds' employer services director – refers to the 2007 Collection Policy as the "2009 Collection Policy." (May 12, 2016 Powers Decl. (Dkt. No. 45) ¶ 13; see also Pltf. R. 56.1 Stmt. (Dkt. No. 47) ¶ 23)  The Collection Policy attached to Powers' declaration is dated 2007, however.  Accordingly, the Court refers to this Collection Policy as the "2007 Collection Policy." (See 2007 Collection Policy (Dkt. No. 45) Ex. 14)

(Dkt. No. 45) Ex. 14, Sec. III(1); see 2014 Collection Policy (Dkt. No. 45) Ex. 15, Sec. II(2))

Halcyon agrees that it "was required to submit contributions and remittance reports each week"

of the audit period (see Def. Br. (Dkt. No. 51) at 13-14), and maintains that "[i]t has always been

Halcyon's custom and practice to submit a remittance report along with its payment of

contributions." (Gencarelli Decl. (Dkt. No. 49) ¶ 8)  Halcyon concedes, however, that it

"repeatedly missed payments, and made late payments to the Funds days, weeks and sometimes

months after they were due."[6]  (Def. Br. (Dkt. No. 51) at 14)

        The Collection Policies also set forth the Funds' obligation to send a notice to

known delinquent employers reminding the employer of the ramifications of failing to pay

contributions by the due date or by the end of a grace period.  (See 2007 Collection Policy (Dkt.

No. 45) Ex. 14; 2014 Collection Policy (Dkt. No. 45) Ex. 15)

        The 2007 Collection Policy states that "[i]nterest owed by a delinquent employer

shall be calculated at a rate to be periodically determined by the Board of Trustees. . . . Interest

shall accrue from the date the contributions were due to the date when payment of the

contributions is received. . . ."  (2007 Collection Policy (Dkt. No. 45) Ex. 14, Sec. VIII(1))

(emphasis in original)  The 2014 Collection Policy – dated March 20, 2014 – states that the

Funds are entitled to collect – in addition to the delinquent principal contributions – (1) interest

"calculated at the prime lending rate of Citibank plus 200 basis points . . ."; (2) a delinquency

assessment, which consists of "the greater of (a) interest on the delinquent contributions . . . ; or

(b) liquidated damages in the amount of twenty percent (20%) of the principal amount of all

---

[6]  According to Defendant, "[t]he Funds were aware of the late-payments in issue when they
occurred, or at the very least became aware of the late payments in issue sometime prior to
February 18, 2009 when Halcyon submitted remittance reports identifying the late payments."
(Def. R. 56.1 Resp. (Dkt. No. 52) ¶ 15)

delinquent contributions"; and (3) attorneys' fees and costs incurred by the Funds in collecting the delinquency. (2014 Collection Policy (Dkt. No. 45) Ex. 15, Sec. V at 8)

In 2012, prior to the instant action, the Funds audited Halcyon's books for the period July 1, 2002 through May 30, 2004 (the "First Audit Period"). On December 28, 2012, the Funds demanded that an alleged deficiency of $404,521.94 be paid. (See Petition (Dkt. No. 25 in 13-cv-1356) Ex. 1 ¶ 10) Halcyon disputed the amount of unpaid contributions, however, and the parties proceeded to arbitration. (See id. ¶¶ 11-14)

On January 31, 2013, the Funds requested a second audit covering the period from January 1, 2007 through March 29, 2014 (the "Second Audit Period"). (See Def. R. 56.1 Resp. (Dkt. No. 52) ¶ 6; S&P Ltr. (Dkt. No. 50) Ex. B at 2; Powers Dep. Tr. (Dkt. No. 50) Ex. A, Part 2 at 19-22) On February 7, 2013, Halcyon filed a petition in this District to stay the arbitration proceeding regarding the First Audit Period (the "2013 Action"). (See Pltf. R. 56.1 Resp. (Dkt. No. 59) ¶ 7 at 5; Petition (Dkt. No. 25 in 13-cv-1356) Ex. 1) On February 27, 2013, Halcyon notified the Funds that it would not consent to the second audit request, stating that it "was not a party to any collective bargaining agreement or other contract . . . during the Proposed Audit Period [of January 1, 2007 through March 29, 2014]." (Feb. 27, 2013 Def. email (Dkt. No. 57) Ex. 24)

On March 11, 2013, the Funds asserted counterclaims in the 2013 Action seeking (1) a declaratory judgment that Halcyon was bound by a CBA running "from January 1, 2007 through the present"; (2) an order compelling Halcyon to submit to an audit covering the Second Audit Period; and (3) recovery of delinquent contributions disclosed by the requested second audit. (See Pltf. Answer (Dkt. No. 56) Ex. 20 ¶¶ 82-95, 100-01)

On April 10, 2014, the parties filed a Stipulation and Order of Settlement and

Dismissal as to the 2013 Action. (See Stipulation of Settlement (Dkt. No. 56) Ex. 23) As part of

the settlement, Halcyon agreed that, upon the Funds' written request, it would submit to an audit

covering the Second Audit Period – January 1, 2007 through March 31, 2014. (See id. ¶ 3)

The Stipulation of Settlement in the 2013 Action also states that "[n]othing in this

Stipulation and Order constitutes an agreement by any party or a determination by the Court

concerning whether [Halcyon] is or is not bound by any collective bargaining agreement with the

[Funds]." (Id. ¶ 4) The parties also agreed that the Funds' counterclaim,

> which seeks to recover any unpaid amounts that may be identified by an audit covering
> the Second Audit Period, is not ripe for adjudication because such an audit has not yet
> been conducted. Consequently, [the Funds'] counterclaim is hereby dismissed without
> prejudice. Neither this Stipulation and Order nor the doctrine of res judicata shall be
> construed or applied to prevent [the Funds] from initiating a new proceeding to collect
> from [Halcyon] any allegedly unpaid amounts for the Second Audit Period, nor prevent
> by doctrine of res judicata or otherwise any defenses, both procedural and substantive,
> [Halcyon] may have to such a proceeding.

(Id. ¶ 5)

Pursuant to the Stipulation of Settlement, in April 2014, Halcyon submitted its

books and records for the January 1, 2007 to March 29, 2014 period to Plaintiffs' auditors,

Schultheis & Panettieri, LLP ("S&P"). (See Pltf. R. 56.1 Stmt. (Dkt. No. 47) ¶¶ 29-30) S&P

issued its audit report on October 27, 2014. (See Def. R. 56.1 Resp. (Dkt. No. 52) ¶ 8)

S&P determined that Halcyon "owe[d] a total of $75,315.85 to the Funds,

consisting of: (1) contributions of $27,114.08; (2) interest (as of June 30, 201[6]) of $11,312.23;

(3) audit costs of $6,199, (4) late payment assessments (late payment interest) of $25,267.72, and

6

(5) liquidated damages [consisting of the delinquency assessment] of $5,422.82." (See Sgroi Decl. (Dkt. No. 44) ¶ 12)[7]

Christine Gencarelli, Halcyon's payroll manager, testified that the auditor's calculation of the principal amount of Defendant's delinquent contributions – $27,114.08 – is correct. (See Gencarelli Dep. Tr. (Dkt. No. 43) Ex. 2 at 24:4-25) While "Halcyon is not contesting S&P's calculation of that principal amount," Halcyon is "contest[ing] [the] portion of that principal amount that falls outside the statute of limitations." (Gencarelli Decl. (Dkt. No. 49) ¶ 11)

Plaintiffs filed the instant action on February 19, 2015. (See Cmplt. (Dkt. No. 1))

## DISCUSSION

## I.  LEGAL STANDARDS

### A.  Summary Judgment Standard

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential

---

[7]  Plaintiffs now claim that they are owed $81,205.26, however.  The $5,889.41 increase is attributable to a provision in the 2007 Collection Policy stating that "[t]he amount of the delinquency assessment shall be the greater of (a) interest on the delinquent contributions [ – here, $11,312.23 – ]. . . or (b) liquidated damages in the amount of twenty percent (20%) of the principal amount of all delinquent contributions[, which here amounts to $5,422.82]."  (2007 Collection Policy (Dkt. No. 45) Ex. 14, Sec. VIII(3); see Pltf. Br. (Dkt. No. 46) at 9)

7

Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp.,

Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of

the same event is not in itself sufficient to preclude summary judgment,' in that contradictory

testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'"

Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y.

June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

   In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting

Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation

omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory

allegations or denials . . . cannot by themselves create a genuine issue of material fact where

none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in

original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

   "The same standard[s] appl[y] where, as here, the parties file[] cross-motions for

summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues

of material fact, a court need not enter judgment for either party.  Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration." Id. (internal citations omitted).

**B.** **Application of Statute of Limitations in ERISA Cases**

Section 515 of ERISA requires any employer that is "obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement" to "make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. "Under Section 502 of ERISA, private civil actions may be brought by plan trustees against employers who are delinquent in making contributions." Bldg. Serv. 32BJ Health Fund v. Nutrition Mgmt. Servs. Co., No. 15 Civ. 03598 (KBF), 2017 WL 946331, at *2 (S.D.N.Y. Feb. 10, 2017) (citing Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co., 484 U.S. 539, 547 (1988)).

Actions to recover delinquent contributions under ERISA are subject to New York's six-year statute of limitations for breach of contract actions. See Trustees of the United Plant v. C.P. Perma Paving Constr., Inc., No. 15 Civ. 1171 (AMD) (SMG), 2016 WL 1029507, at *4 (E.D.N.Y. Mar. 9, 2016); Hanley v. Aperitivo Rest. Corp., No. 97 Civ. 5768 (MBM), 1998 WL 307376, at *7 (S.D.N.Y. June 11, 1998); see also O'Hare v. General Marine Transp. Corp., 740 F.2d 160, 167 (2d Cir. 1984).

"Although state law furnishes the statute of limitations in an action for unpaid contributions under ERISA, federal law determines when the limitations period begins to run." Aperitivo, 1998 WL 307376, at *7; see Stull v. Bayard, 561 F.2d 429, 432 (2d Cir. 1977) ("We look to federal law . . . to determine when the limitations period starts to run."); Northern California Retail Clerks Unions and Food Emp'rs Joint Pension Tr. Fund v. Jumbo Mkts., Inc., 906 F.2d 1371, 1372 (9th Cir. 1990). "Under federal law, the statute of limitations begins to run 'when the plaintiff knows or has reason to know of the injury that is the basis of the action.'"

9

Aperitivo, 1998 WL 307376, at *7 (quoting Jumbo Markets, 906 F.2d at 1379); see Leon v. Murphy, 988 F.2d 303, 309 (2d Cir. 1993).

   "In the context of an ERISA action . . . for delinquent employee benefit contributions, the trustees of an employee benefit fund know or have reason to know of the injury that forms the basis of their claims for delinquent contributions 'when the [f]unds ha[ve] 'reason to awaken inquiry' about irregularities in [employer] contributions sufficient to prompt the [f]unds, in the exercise of due diligence, to conduct an audit.'" Hanley v. Cafe des Artistes, Inc., No. 97 Civ. 9360 (DC), 1999 WL 688426, at *8 (S.D.N.Y. Sept. 3, 1999) (quoting Aperitivo, 1998 WL 307376, at *8 (quoting Sheet Metal Workers, Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1282 (3d Cir. 1991))). Accordingly, "[t]he earliest point at which the plaintiffs' claim for nonpayment of fund contributions could [begin to] accrue[] [i]s when the first . . . contribution date passe[s] without payment." Perma Paving, 2016 WL 1029507, at *4 (citing cases). "[T]he first incident of non-payment to the Funds may [be] sufficient to place the plaintiff Trustees on notice of the defendants' alleged breach." Id.

   "'Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued.'" Lynch v. Inter-Cty. Bldg. Materials Corp., No. Civ 05-01801 (DRH) (GRB), 2013 WL 5652524, at *6 (E.D.N.Y. Oct. 15, 2013) (quoting Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995)). "Defendants 'cannot carry [this] burden merely by pointing to the absence of evidence supporting the non-moving parties claim' or position, but must come forward with affirmative evidence showing the absence of a triable issue of fact regarding the validity of the defense." La Barbera v. R. Rio Trucking, No. 03 Civ. 1508 (SLT) (AKT), 2007

WL 2177063, at *4 (E.D.N.Y. July 27, 2007) (quoting <u>Levy v. Aaron Faber, Inc.</u>, 148 F.R.D. 114, 119 n.1 (S.D.N.Y. 1993)).

       "[T]he key issue in determining when the Funds 'had reason to know' of the inaccuracies is not whether the Funds could have audited the [defendant's] books at an earlier time, but rather whether they should have done so." <u>Aperitivo</u>, 1998 WL 307376, at *8 (citing <u>Michigan United Food and Commercial Workers Unions and Drug and Mercantile Employees Joint Health and Welfare Fund v. Muir Co.</u>, 992 F.2d 594, 598 (6th Cir. 1993); <u>Sheet Metal Workers</u>, 949 F.2d at 1282)). "This question, in turn, hinges on when the Funds had 'reason to awaken inquiry' about irregularities in [the defendant's] contributions sufficient to prompt the Funds, in the exercise of due diligence, to conduct an audit." <u>Id.</u> (quoting <u>Sheet Metal Workers</u>, 949 F.2d at 1282) (citing <u>Muir</u>, 992 F.2d at 599 for the proposition that the "crucial" issue is whether the Funds "had sufficient notice of probable discrepancies in the employer's contributions reports that the concept of due diligence required them to investigate").

## II.   <u>ANALYSIS</u>

       Plaintiffs claim that Halcyon owes a total of $81,205.26 consisting of: (1) $27,114.08[8] in unpaid contributions; (2) $11,312.23 in interest on the unpaid contributions; (3) $11,312.23 in liquidated damages concerning the unpaid contributions; (4) $25,267.72 in late-payment interest; and (5) $6,199 in audit costs. (<u>See</u> Pltf. Br. (Dkt. No. 46) at 5)

       As noted above, Halcyon does not dispute its liability for the audit expenses, or for unpaid contributions, interest, and liquidated damages related to contributions due between February 19, 2009 and March 29, 2014. As to unpaid contributions, interest, liquidated damages,

---

[8] Plaintiffs variously state that they are entitled to principal unpaid contributions in the amounts of $27,114.08 and $27,114.28. (<u>Compare</u> Pltf. Br. (Dkt. No. 46) at 4, 8 <u>with id.</u> at 5, 14) The Court concludes that the reference to $27,114.28 is a typographical error.

11

and late-payment interest relating to contributions due prior to February 19, 2009, however, Halcyon contends that Plaintiffs' claims are barred by the six-year statute of limitations. (See Def. Br. (Dkt. No. 51) at 11-15; Def. Reply Br. (Dkt. No. 53) at 6) Defendant further contends that Plaintiffs' claim for late-payment interest – amounting to $25,267.72 – should be rejected because (1) it is barred by the doctrines of waiver and laches; and (2) Plaintiffs have not stated the applicable interest rate. (See Def. Br. (Dkt. No. 51) at 15, 18)

## A.    Damages Related to Contributions Due Before February 19, 2009

The Complaint was filed on February 19, 2015. (Cmplt. (Dkt. No. 1)) Accordingly, for damages related to contributions due before February 19, 2009, this Court must determine whether Halcyon has demonstrated that Plaintiffs "had 'reason to awaken inquiry' about irregularities in [Halcyon's] contributions sufficient to prompt the Funds, in the exercise of due diligence, to conduct an audit." Aperitivo, 1998 WL 307376, at *8; see also Nutrition Mgmt., 2017 WL 946331, at *2.

It is undisputed that "[t]he missing contribution payments began [o]n January 6, 2007 and continued thereafter, with less frequency as time progressed, through the audit period." (Def. R. 56.1 Resp. (Dkt. No. 52) ¶ 10 (citing Audit (Dkt. No. 44) Ex. 3)); see Pltf. R. 56.1 Resp. (Dkt. No. 59) ¶ 10) Plaintiffs further concede that the first missed contribution payment was January 1, 2007. (Pltf. Reply Br. (Dkt. No. 58) at 16 (citing Sgroi Decl. (Dkt. No. 44) Ex. 3 at 19)) What the parties dispute, however, is whether the Funds should have realized that contributions were missing during the period between January 6, 2007 and February 19, 2009. (See Def. Br. (Dkt. No. 51) at 13; Pltf. Br. (Dkt. No. 58) at 15)

With respect to their pre-February 19, 2009 claims, Plaintiffs contend that without

12

Defendant's internal payroll records – which Plaintiffs had no access to until the Second Audit – they "could not have reasonably discovered these delinquencies." (Pltf. Reply Br. (Dkt. No. 58) at 15)

Halcyon argues, however, that it routinely missed contribution payments and submitted these payments late, and that the remittance reports it submitted to the Funds with its contributions put the Funds on notice of these discrepancies, triggering inquiry notice:

> This is not a case where required contributions were never made, such that, under the Funds' self-reporting system they could possibly claim they never knew the payments became due. Halcyon . . . was required to submit contributions and remittance reports each week. . . . Nevertheless, Halcyon repeatedly missed payments, and made late payments to the Funds days, weeks and sometimes months after they were due. At the time these alleged late payments were made, Halcyon transmitted remittance reports to the Funds alerting the Funds that these payments were being submitted late.

(Def. Br. (Dkt. No. 51) at 13-14)

The remittance reports cited by Halcyon have not been submitted to the Court, however, nor has Halcyon offered evidence demonstrating when the remittance reports were submitted to the Funds. Instead, Defendant offers only vague and conclusory statements about when these reports were submitted. (See, e.g., Def. R. 56.1 Resp. (Dkt. No. 52) ¶ 15 ("The Funds were aware of the late-payments in issue when they occurred, or at the very least became aware of the late payments in issue sometime prior to February 18, 2009 when Halcyon submitted remittance reports identifying the late payments."); Gencarelli Decl. (Dkt. No. 49) ¶ 8 ("It is also my understanding that the Funds require submission of a remittance report at the time contributions are paid, identifying the pay period for which contributions are made, the individuals employed, and the number of hours worked by each such individual. It has always been Halcyon's custom and practice to submit a remittance report along with its payment of contributions.")) Given that Defendant has provided no remittance reports in connection with

13

the cross-motions for summary judgment, these vague and conclusory statements about Halcyon's "custom and practice" are not sufficient to demonstrate (1) that Defendant did in fact submit remittance reports to the Funds; (2) the information the remittance reports contained; or (3) when the remittance reports were provided to the Funds. See Hicks, 593 F.3d at 166 ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (internal quotation marks omitted).

Even assuming arguendo that Halcyon submitted remittance reports to the Funds, without access to the reports, this Court cannot determine whether they would be sufficient to put the Funds on notice of inaccuracies and discrepancies. (See Jan. 19, 2016 Powers Dep. (Dkt. No. 50) Ex. A , Part 4 at 67:22-26, 68:6-17 (stating that while the Funds initially utilized a standard remittance report form, this practice ended during the Second Audit Period, and employers then submitted their own forms and spreadsheets with a breakdown of the hours worked and the contributions due)) Indeed, based on the record before this Court, it is not even clear that the remittance reports Halcyon allegedly sent to the Funds would have given the Funds notice of missed payments.

In contrast to Defendant's showing, the Funds have offered evidence demonstrating that – without access to Defendant's internal payroll records – they could not detect delinquent contributions.

As an initial matter, Plaintiffs note that, "[d]uring the Second Audit Period, the Funds were tasked with managing the contributions of over 1,000 employers at any given time." (Pltf. R. 56.1 Resp. (Dkt. No. 59) ¶ 15) "To accomplish the sizable task of managing this many employers, the Funds maintained a self-reporting system, which put the onus on the employer – the party with the most accurate knowledge of the number of covered hours worked by its

.

employees – to self-report the contributions it owed to the Funds for that particular week." (Id.)
Pursuant to this self-reporting system – in the absence of an audit – the Funds depended on the
accuracy of Defendant's self-reporting. See Connors v. Hallmark & Son Coal Co., 935 F.2d 336,
342-43 (D.C. Cir. 1991) (noting that "the Trustees remain dependent upon the [employer's]
honesty and accuracy: the records with which the Trustees might verify the accuracy of the
[employer's] reporting––as well as the accuracy of their contributions––both originate and stay
with the [employers].").

      Tony Sgroi – a director of S&P – has offered a declaration explaining that
Halcyon's delinquent contributions only came to light after "S&P reviewed Defendant's payroll
records, which were obtained in the audit, and compared them with the records of Defendant's
contributions to the Funds during the audit period."[9] (Sgroi Decl. (Dkt. No. 55) ¶ 8) Luke
Powers, the Funds' employer services director, notes that, "to uncover an employer's
delinquencies[,] the Funds would need to have an auditor review the employer's payroll records,
cash disbursement records, and other sensitive documents that are normally inaccessible to the
Funds. As such, the Funds oftentimes have no means of discovering these delinquencies until
after an audit of the employer is completed."[10] (June 24, 2016 Powers Decl. (Dkt. No. 57) ¶¶ 29-
30)

---

[9] The determination of delinquency was somewhat complex here. As a result of the audit,
Plaintiffs learned that, as to certain employees, Halcyon was not remitting contributions at the
"journeyman rate," and was instead remitting contributions at the lower "apprentice rate." (Sgroi
Decl. (Dkt. No. 55) ¶ 7 (citing Ex. 16))
[10] Although Plaintiffs obtained a software program in 2012 that automatically reviewed
employers' remittance reports, this program "would not pick up a substantial number of
delinquencies that are found to occur, such as situations where the employer failed to report
hours of covered work its employees performed for a specific week." (June 24, 2016 Powers
Decl. (Dkt. No. 57) ¶ 11) In any event, the period at issue – for purposes of Defendant's statute
of limitations argument – is January 2007 to February 2009, and this software program was not
obtained until 2012. (Id.)

Finally, as noted above, the Funds' Collection Policies reflect an internal policy of sending a "reminder notice" to a known delinquent employer reminding the employer of the potential ramifications if it fails to pay contributions as required under the CBA. (See id. ¶ 25) Here, however, the Funds allege that they did not know of the delinquencies until the Second Audit was completed, and – while evidence of such a reminder notice would demonstrate that the Funds were on notice of a delinquency – neither side has offered evidence that the Funds sent a reminder notice to Halcyon. Indeed, Defendant complains that "[t]he Funds failed to . . . send the notice of delinquency advising of the possible imputation of interest." (Def. Br. (Dkt. No. 51) at 6)

In order to prevail on its cross-motion for summary judgment based on its statute of limitations defense, the "[d]efendant[] . . . must come forward with affirmative evidence showing the absence of a triable issue of fact regarding the validity of the defense." La Barbera, 2007 WL 2177063, at *4. Here, Defendant has not met this burden. Indeed, the Court concludes that Halcyon has not offered sufficient evidence to raise a material issue of fact as to whether the Funds knew or should have known of its delinquent contributions prior to the Second Audit. See Laborers' Pension Tr. Fund--Detroit & Vicinity v. Brick Faced Concrete Walls, Inc., No. 07-12859, 2008 WL 1902038, at *6 (E.D. Mich. Apr. 28, 2008) ("[T]he defendant in this case claims that it submitted 'monthly reports' to the plaintiff funds, but there is no evidence in the record about these reports. Without more information, it is impossible to know whether the plaintiffs had information in [their] possession that should have 'awakened inquiry,' or when that information came into the possession of the plaintiffs. Moreover, the parties had just resolved a dispute over benefits contributions in [a prior audit period], and there is nothing in the record to suggest that the plaintiffs' suspicions should have been re-aroused.") (emphasis in original); see

16

also <u>Nutrition Mgmt.</u>, 2017 WL 946331, at *2 (finding that no reasonable factfinder could conclude that the Fund's claims were time-barred where the defendant failed to present any evidence that the Fund was aware of the irregularities of its contributions or that "the irregularities rose to a level that should have awakened an inquiry by the Fund") (citing <u>Cafe des Artistes</u>, 1999 WL 688426, at *8).

Accordingly, Plaintiffs are entitled to summary judgment with respect to their claims for audit expenses, unpaid contributions, interest on the unpaid contributions, and liquidated damages, including with respect to contributions that were due between the period from January 1, 2007 to February 18, 2009.[11]

### B. Late-Payment Interest

Plaintiffs argue that, under the Millwright CBA and the LMRA, 29 U.S.C. § 185, they are entitled to $25,267.72[12] in late-payment interest. (<u>See</u> Pltf. Br. (Dkt. No. 46) at 5, 9) "Late-payment interest" is interest due on the contribution payments that Defendant made after the CBA's specified "grace period." "The audit reports indicate that the late payments in issue were made to the Funds beginning [o]n June 4, 2007 and frequently thereafter through February 2012." (Pltf. R. 56.1 Resp. (Dkt. No. 59) ¶ 13)

---

[11] The Court also concludes that Plaintiffs' claim for late-payment interest is not barred by the statute of limitations. Defendant claims that Plaintiffs' claim for late-payment interest is barred not only by the statute of limitations, however, but also by virtue of waiver, laches, and Plaintiffs' failure to state the applicable interest rate. (<u>See</u> Def. Br. (Dkt. No. 51) at 15-19) These arguments are addressed below.

[12] Plaintiffs variously state that they are entitled to late-payment interest in the amounts of $25,257.72 and $25,267.72. (<u>Compare</u> Pltf. Br. (Dkt. No. 46) at 11, 14 <u>with</u> <u>id.</u> at 5, 9) The Court concludes that the reference to $25,257.72 is a typographical error.

Defendant objects to Plaintiffs' claim for late-payment interest, contending that it is barred by the doctrines of waiver and laches, and because Plaintiffs have not specified the applicable interest rate. (See Def. Br. (Dkt. No. 51) at 15-19)

"ERISA itself does not allow recovery of interest on late-paid contributions. However, the LMRA provides a statutory basis for enforcing the contractual terms of the CBA." Gesualdi v. Gen. Concrete, Inc., No. 11 Civ. 1866 (CBA) (JO), 2013 WL 1192967, at *6 (E.D.N.Y. Feb. 1, 2013), report and recommendation adopted as modified, No. 11 Civ. 01866 (CBA) (JO), 2013 WL 1192954 (E.D.N.Y. Mar. 22, 2013); see Finkel v. MJC Elec., Inc., No. 13 Civ. 3293 (CBA) (SMG), 2014 WL 4628864, at *4 (E.D.N.Y. July 30, 2014), report and recommendation adopted, No. 13 Civ. 3293 (CBA) (SMG), 2014 WL 4628882 (E.D.N.Y. Sept. 15, 2014) ("An award of damages is . . . available under the LMRA for those contributions not covered by ERISA but unpaid or paid late in violation of a CBA or other contract.").

### 1.   **Waiver**

Defendant argues that, while "the Funds had the right to seek this late-payment interest long-ago, from the date of the first missed payment," Plaintiffs' failure to request late-payment interest resulted in waiver. (Def. Br. (Dkt. No. 51) at 15)  Plaintiffs argue that they did not know of their late-payment interest claim until the completion of the Second Audit on October 27, 2014. Accordingly, they did not intentionally relinquish their right to late-payment interest. (See Pltf. Reply Br. (Dkt. No. 58) at 25)

Waiver is an affirmative defense, see Fed. R. Civ. P. 8(c)(1); Katzenberg v. Lazzari, No. 04 Civ. 5100 (CBA), 2007 WL 1017645, at *16 (E.D.N.Y. Mar. 12, 2007), and "[t]o survive summary judgment, [the proponent of waiver] must produce 'evidence of an intentional relinquishment of a known right.'" Readco, Inc. v. Marine Midland Bank, 81 F.3d

295, 303 (2d Cir. 1996) (quoting Hayes v. Crane Hogan Structural Sys., 191 A.D.2d 978, 979 (4th Dep't 1993)).

"Waiver may be established by affirmative conduct or by a failure to act that evinces the intent to abandon the right." Jordan v. Can You Imagine, Inc., 485 F. Supp. 2d 493, 499 (S.D.N.Y. 2007) (citing Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist., 85 N.Y.2d 232, 236, 647 N.E.2d 1329 (1995)). Given that waiver turns on questions of intent, it is generally not susceptible to summary judgment. See Champion Spark Plug Co. v. Auto. Sundries Co., 273 F. 74, 79-80 (2d Cir. 1921) (waiver of a contract right is generally a question for the jury); Randolph Equities, LLC v. Carbon Capital, Inc., 648 F. Supp. 2d 507, 517 (S.D.N.Y. 2009) ("Whether a party has the intent to waive a contractual right is generally a matter of fact, not a matter of law."); Jefpaul Garage Corp. v. Presbyterian Hosp. in City of N.Y., 61 N.Y.2d 442, 448 N.E.2d 1176 (1984) ("the intent to waive is usually a question of fact").

Halcyon's waiver defense fails as a matter of law for the same reasons that its statute of limitations defense fails as a matter of law. Halcyon has not offered sufficient evidence to create a material issue of fact as to whether Plaintiffs knew that Halcyon was not making the required contribution payments in a timely fashion.

Although Defendant argues that Plaintiffs had "actual, or at least constructive knowledge, of [Defendant's] failure to pay interest," and that Plaintiffs' acceptance of repeated and chronic late payments over the course of seven to eight years demonstrates that Plaintiffs intended to relinquish their right to late-payment interest (see Def. Br. (Dkt. No. 51) at 15; id. at 6 ("The Funds routinely accepted Halcyon's late payments without ever requesting the payment of interest thereon. The Funds failed to follow their own Collection Policy and send the notice of delinquency advising of the possible imputation of interest, nor did they take any other steps

during the 7 year audit period to collect the late-payment interest they now seek.")), there is no evidence that Plaintiffs knew – prior to the Second Audit – that Halcyon had been delinquent in making the required contributions.

### 2. Laches

Defendant argues that Plaintiffs' claim for late-payment interest is also barred by the doctrine of laches. (See Def. Br. (Dkt. No. 51) at 16)

"The equitable defense of laches 'bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant.'" Guardian Music Corp. v. James W. Guercio Enters., Inc., 459 F. Supp. 2d 216, 223 (S.D.N.Y. 2006), aff'd, 271 F. App'x 119 (2d Cir. 2008) (quoting Amtrak v. Morgan, 536 U.S. 101, 121-22 (2002)). "A party asserting this defense must prove '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" Id. (quoting Amtrak, 536 U.S. at 121-22); see Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 192 (2d Cir. 1996) ("In order to prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action."). "Laches is a defense against claims in equity, not claims at law, such as damages for non-performance of a contract." Guardian Music, 459 F. Supp. 2d at 233 (citing United States v. Gordon, 78 F.3d 781, 786 (2d Cir. 1996)).

Halcyon's laches defense fails for numerous reasons. First, Halcyon has not shown a lack of diligence on Plaintiffs' part, because Halcyon has not shown that Plaintiffs knew of their right to late-payment interest and sat on their rights. Second, Halcyon has not shown that it suffered any prejudice as a result of Plaintiffs' delay in making a claim for late-payment

interest.[13] Finally, "laches is a defense against claims in equity," id., and Plaintiffs' claim for late-payment interest is a claim for money damages, pursuant to the Millwright CBA. For all these reasons, Defendant's laches defense fails.

### 3. Alleged Failure to State Applicable Interest Rate

Lastly, Defendant argues that Plaintiffs' claim for late-payment interest must be denied because Plaintiffs have not identified the applicable interest rate in effect at the time of the late payments. (See Def. Br. (Dkt. No. 51) at 18)

The Funds' 2007 Collection Policy states that

> Interest owed by a delinquent employer shall be calculated at a rate to be periodically determined by the Board of Trustees. . . . Although interest shall accrue it shall not be assessed against a delinquent employer if the employer's delinquent contributions are received within the applicable "Grace Period" as provided in the applicable collective bargaining agreement. . . . If, however, such delinquent contributions are not received by the end of the applicable Grace Period, interest shall be assessed against the delinquent employer for every day since the contributions were due and interest shall continue to accrue to the date when payment of the delinquent contributions is received.

(2007 Collection Policy (Dkt. No. 45) Ex. 14, Sec. VIII, ¶¶ 1-2)

---

[13] Defendant's contention that it suffered economic and evidentiary prejudice is unpersuasive. (See Def. Br. (Dkt. No. 51) at 17) With regard to economic prejudice, Defendant complains that "it is now confronted with a potential judgment [of] over $25,000 in late-payment interest, which accrued over a three-year period." According to Defendant, "[h]ad the Funds acted with proper diligence [and] followed their own Collection Policy, the failure to pay late-payment interest would have been discovered long ago." (Id.) Defendant has cited no case supporting its argument that these circumstances demonstrate "prejudice" for purposes of a laches defense.

Defendant also claims that it suffered evidentiary prejudice, because Melinda Ryan – "[t]he individual at Halcyon who handled payroll and was responsible for remitting contribution payments during the time-period in issue for late payment interest [ – ] is no longer employed by Halcyon, and therefore Halcyon's ability to respond to the substance of the late-payment interest claim is inhibited." (Id. at 17) But Halcyon does not assert that it has made any effort to contact or consult with Ryan concerning the late-payment interest issue. Under these circumstances, Halcyon has not shown prejudice.

21

Here, the record shows that the Trustees determined that interest would be calculated based on Citibank's prime rate over the relevant years, plus 2%. Powers – the Funds' employer services director – explains these calculations in his declaration:

> 22.   During the entirety of the Second Audit Period, the Funds' Trustees determined that interest was to be calculated based on Citibank's historical interest rates plus 200 basis points (2%).
>
> 23.   The applicable interest rates during the Second Audit Period were as follows:
>
> > a.  January 1, 2007 through December 31, 2007: 10.25%
> >
> > b.  January 1, 2008 through June 30, 2008: 9.25%
> >
> > c.  July 1, 2008 through December 31, 2008: 7.00%
> >
> > d.  January 1, 2009 through the end of the Second Audit Period: 5.25%
>
> 24.   The above-referenced interest rates include the 2% increase that was applied to Citibank's historical interest rates.

(June 24, 2016 Powers Decl. (Dkt. No. 57) ¶¶ 22-24; see Sgroi Decl. (Dkt. No. 44) ¶ 9)[14] In determining that Defendant owed $25,267.72 in late-payment interest, S&P multiplied the amount of the late payment by Citibank's prime rate plus 2%. (See Sgroi Decl. (Dkt. No. 44) ¶¶ 8-9) There is no evidence that Defendant objected to these calculations when the audit report was produced in 2014, nor does Defendant argue now that a different interest rate should apply. (See Pltf. R. 56.1 Stmt. (Dkt. No. 47) ¶ 38; Def. R. 56.1 Resp. (Dkt. No. 52) ¶ 38 at 6, ¶ 12 at 8; Audit (Dkt. No. 44) Ex. 3)

The Court concludes that Plaintiffs have provided the applicable interest rate for purposes of calculating late-payment interest.

---

[14] The 2014 Collection Policy also specifies that "[i]nterest owed by a delinquent employer shall be calculated at the prime lending rate of Citibank plus 200 basis points." (2014 Collection Policy (Dkt. No. 45) Ex. 15, Sec. V at 8)

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment is granted, and Defendant's motion for summary judgment is denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 42, 48) and to enter judgment.[15]

Dated: New York, New York
       March 31, 2017

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[15] Although Plaintiffs claim that they are entitled to an award of attorneys' fees and costs, this issue has not been briefed. (See Pltf. Reply Br. (Dkt. No. 58) at 24 n.6)